CALOGERO, Justice.
Plaintiff’s home was located in the path of a new interstate highway which was being constructed by the Louisiana Department of Transportation and Development (DOTD). By virtue of a “voluntary acquisition agreement,” she sold her house and adjacent structures to DOTD for $248,380 ($185,767 for the main residence and $62,-613 for other improvements on the property). Her request for additional compensation for relocation costs and moving expenses was denied, and she filed this action against DOTD seeking recovery of those expenses.
*242 Plaintiff’s position is that it will cost much more than the $248,380 she received from DOTD for the sale of her existing home to construct a new home of comparable size and quality. She alleges that DOTD employees induced her to sell her home for $248,380 by promising her that she would be paid any additional amounts necessary to construct a new home of comparable quality.
The trial court agreed that DOTD’s employees had made such a promise, and on that basis held that plaintiff is entitled to recover $170,742.85 in replacement housing costs. That amount represents the difference between the amount which the trial court found that the plaintiff would have to expend in order to construct a virtual replica of her existing home, $410,742.85, and the amount she received when DOTD purchased her former residence, $248,380. The trial court also held that DOTD is liable to plaintiff for moving expenses in the amount of $8,000.
The court of appeal affirmed, 517 So.2d 1178 (La.App. 3rd Cir.1987). We granted DOTD’s application, 521 So.2d 1176 (La. 1988), and now amend the judgments below to order a reduction of plaintiff’s award for replacement housing benefits.
For reasons hereafter set forth, we hold that plaintiffs are not entitled to replacement housing benefits on the basis of any verbal contract with DOTD. While the holdings of the lower courts were premised on the existence of such a contract, we find no evidence in the record which establishes that such a binding oral agreement existed.
Instead, plaintiff’s claim for replacement housing benefits should be evaluated under the provisions of La.R.S. 38:3101-3110 (the Uniform Relocation Assistance and Real Property Acquisitions Act, as adopted in Louisiana). The trial court’s inquiry should have been whether DOTD’s decision to deny plaintiff’s claim for replacement housing benefits and moving expenses was an unreasonable, arbitrary or capricious exercise of its agency discretion.
Applying that standard of review to the facts of this case, we find that DOTD abused its agency discretion by totally denying plaintiff’s claim for replacement housing benefits. However, our review of the record convinces us that the trial court’s award of $162,362.85 for replacement housing benefits was excessive, and should be reduced to $63,904.
Additionally, we find that DOTD abused its discretion by denying plaintiff’s request for moving expenses. We therefore affirm the $8,000 award allowed by the lower courts for those expenses.
(I) FACTS
(A) Developments Prior to DOTD’s Purchase of the Polks’ Home
Plaintiff Barbara Reaves Polk and her husband, Judge William Polk, own a large tract of property in Rapides Parish near Bayou Bouef. This is a rural area, not far from Alexandria. On a seven or eight acre portion of the Polks’ property rest the house and the adjacent structures which are the subject of this suit. The Polks built the home about twelve years ago. Several years ago, Judge Polk transferred his ownership interest in the home to his wife. For that reason, Mrs. Polk is the sole named plaintiff in the lawsuit.
1-49 is an interstate highway which, when completed, will connect Shreveport and Lafayette. At some point in early 1983 (perhaps earlier; the exact date is unclear from the record), the Polks became aware that the proposed route of 1-49 would pass through or near their home. Judge Polk testified that a DOTD employee met with him at his office and showed him a possible route for 1-49. That proposed route (which was one of three alternative routes) placed the highway very near to his home, but did not require the taking of his home. Judge Polk told the DOTD employee that he would rather see the highway routed through the location of his present home, thereby causing him to relocate, than to live in a home that bordered on an interstate. After that meeting, DOTD selected a route which required the taking of the Polks’ home, although that decision may not have been made in response to Judge Polk's request.
*243 In June, 1983, the Polks met with DOTD District Relocation Officer Joseph Walker at the DOTD’s Alexandria office. It appears from the record that at the time of this meeting, DOTD had made the decision to route the interstate across the Polks’ property in a manner which would require the taking of their home. However, no specific arrangements had been made in that regard, as the DOTD’s proposed route was yet to be surveyed and was subject to approval by the Federal Highway Administration.
The Polks went to Walker’s office to inquire about the mechanics which would be involved when DOTD acquired their property. They were primarily concerned over the amount of time that they would have, to move from their home and relocate once DOTD purchased their property. It is quite clear from the record that the Polks never intended to move to an existing residence. Instead, they intended to use the money they would receive from DOTD to build an identical home nearby, on another portion of their property. The Polks sought assurances from Walker that they would have enough time, between the date that DOTD purchased the property and the date it actually took possession, to build and move into a new home.
Walker told the Polks that when DOTD purchased their property, it would, as required by law, give them 90 days to vacate the premises. The Polks expressed concern over the 90 day period, because they did not think that their new home could be built within such a short time period. Walker told the Polks that exceptions could be made to the 90 day rule if construction on the new home were underway and the Polks were making a good faith effort to vacate. He also stated that DOTD could provide the Polks with temporary housing while their new home was being built.
At this meeting, Walker also gave the Polks a general explanation of DOTD’s policy with regard to relocation benefits. He explained that in addition to the money which the Polks would receive for the sale of their home, they could be eligible for replacement housing benefit payments if the cost of obtaining a comparable home exceeded the purchase price which they were paid for their existing home. He told the Polks that it was DOTD’s policy to provide the Polks with the compensation necessary to obtain a replacement home which is “as good or better than what they were in.” However, no specific estimates of possible relocation payments to which the Polks might be entitled were discussed at the meeting. At this point in time, Walker had not even seen the Polks’ home. Walker told the Polks that relocation benefits could be as low as zero or as high as $15,000, and possibly more than $15,000 if they were to qualify for “last resort” housing benefits (see Section 11(B)(1) of this opinion, infra for discussion of last resort housing benefits).
Finally, Walker told the Polks that when it was. time for them to move, they could use a private moving company and that DOTD would pay the moving expenses. The Polks left the meeting with the understanding that DOTD would contact them further regarding the acquisition of their property.
Over the next few months, the Polks waited for an offer on their home from DOTD, but received none. After writing letters complaining about the delay, Judge Polk was told by DOTD officials that a sale would take place in late 1983 or January, 1984, but no offer was made by the DOTD during that time.
In February, 1984, DOTD real estate agent Terry Brown visited the Polks’ property on what he described at trial as a “fact finding mission.” Brown gathered factual information on the Polks’ home and family, and submitted that information to Robert David, DOTD’s statewide relocation officer. David in turn submitted the information to the Federal Highway Authority, which requires DOTD to submit a “relocation plan” for persons who will be displaced by highway construction.
Brown testified that the federal agency approved the relocation plan submitted by David with respect to the acquisition of the Polks’ property. It appears that the “plan” was simply a general outline of the pro *244 posed acquisition process and an estimate of the relocation needs which might be created when the highway was built. David testified that such plans are routinely prepared by DOTD whenever private property is to be acquired in a highway project (The DOTD Relocation Assistance Manual provides for the preparation of a “Conceptual Stage Relocation Plan,” Rule 5.4.2.1, and a “Right of Way Stage Relocation Program,” Rule 5.4.2.2.) Brown testified that the federal government’s approval of the relocation plan did not mean that the Polks would necessarily qualify for relocation benefits, as that determination, which would depend upon the value of the Polks’ existing residence and the amount that it cost them to obtain comparable housing, was yet to be made.
Brown testified that after his inspection of the property, he called Judge Polk and advised him that the relocation plan had been approved. However, Brown did not tell Judge Polk (because Brown had no way of knowing himself) that the Polks would actually qualify for or receive replacement housing benefits.
(B) DOTD’s Purchase of the Polks’ Residence
After Brown’s visit to their home, the Polks continued to wait for an offer from DOTD. Frustrated with the delays involved, Mrs. Polk went to DOTD’s Baton Rouge office on June 8, 1984 for the purpose of procuring an offer on her home from DOTD. While at the Baton Rouge office, she met with DOTD Relocation Assistance Officer Robert David.
The substance of the conversation between plaintiff ánd David is recounted by the testimony of both of these individuals at trial, testimony which is not conflicting in any major respects. On behalf of DOTD, David offered to purchase the Polk home for $248,380 ($185,767 for the main residence and $62,613 for other improvements on the property).[1] Mrs. Polk informed David that she did not believe that amount would be sufficient for her to be able to obtain another home of comparable quality. David responded that in addition to receiving the purchase price of $248,380, Mrs. Polk would be eligible to receive replacement housing benefits for any amount in excess of the purchase price which had to be expended for the purpose of acquiring a comparable home. At trial, Mrs. Polk recounted David’s explanation of her eligibility for replacement housing benefits as follows:
“Now, when you get ready to relocate and rebuild, the difference it costs between this figure [the sales price] and the actual cost of building your home, that’s your relocation that you are entitled to by law.” R., Vol. Ill at 393.
David further explained to Mrs. Polk that DOTD was not prepared at that time to make any offer for relocation benefits, because it had not yet taken bids on comparable houses in the area of her home and therefore could not provide any estimate on the amount of benefits to which she might be entitled. David also advised Mrs. Polk that she would be eligible to receive reimbursement for moving expenses. He informed her that Jacqueline McGee, DOTD’s District Relocation Officer, would coordinate the taking of bids on comparable housing for the purpose of determining relocation benefits, and would also contact Mrs. Polk regarding reimbursement for moving expenses.
David also explained to Mrs. Polk that it was DOTD’s normal policy to make an offer for relocation benefits at the same time it offered to purchase the property involved. Since the department had not yet made a determination with respect to relocation benefits in the Polks’ case, David said that DOTD could not make a firm purchase offer unless Mrs. Polk waived the *245 right to receive a contemporaneous determination of relocation benefits. After some hesitation, Mrs. Polk agreed to this procedure. She returned to her home with DOTD’s written offer to purchase the home for $248,380. The act of sale was executed 13 days later, on June 21, 1984.
(C) DOTD’s Decision to Deny Replacement Housing Benefits
Following the June 8 meeting, David asked McGee, DOTD’s District Relocation Officer, to obtain estimates on comparable housing in order to determine whether the Polks would receive replacement housing benefits. McGee found that there were no comparable existing homes in the rural area where the Polks resided. Thus, she sought estimates from local contractors on the cost of building a similar home.
The Polk home was 4,020 square feet in size and consisted of six bedrooms, four bathrooms, living room, dining room, sitting room, study and kitchen. Located near the house, and included in the area to be taken by DOTD, were a guest house (1,601 sq. ft.), a swimming pool, a greenhouse, a car shed, an equipment shed and a barn. The main residence and the guest house had a unique, hexagonal shape.
In seeking an estimate for the cost of building a comparable residence, McGee sought bids from a local building contractor, Donald Mansour, and from John Gir-linghouse, a local building contractor and real estate appraiser who had appraised the Polk property for DOTD in April, 1984.
Mansour relegated the state’s request to one of his assistants, Rick Tompkins. On June 25, 1984, Mansour issued an estimate to McGee, prepared by Tompkins, which stated that a home of the same size and the same number of rooms as the Polk home could be constructed for $164,441. Mans-our testified at trial that Tompkins based his estimate on information given to him over the telephone by McGee (Tomkins did not testify). Tompkins apparently did not view the Polk home prior to preparing the estimate. He sought to provide an estimate for a home of the same size and number of rooms, and constructed of quality materials, but not to provide an estimate for building a replica of the Polk home. His bid did not include the cost of replacing the pool or any of the outbuildings.
Girlinghouse, on the other hand, prepared an estimate for McGee of the cost of building a virtual replica of the Polk home. In preparing this estimate, Girlinghouse used the information he compiled when appraising the home and outbuildings. At trial, Girlinghouse testified that he used a “stick by stick” replacement cost method in making his estimate, which involved noting and counting the exact materials which were used to construct the house, determining the purchase price of those materials from reputable subcontractors, and adding in labor and overhead. He estimated that it would cost $204,711.23 to build a similar home (including a greenhouse located near the main residence, but excluding the guesthouse, pool, and other outbuildings, see footnote one, supra). He also testified that “after deducting for depreciation,” the main residence was worth $163,-875. Girlinghouse appraised the current market value of the guest house, swimming pool and other outbuildings, but did not estimate the actual replacement costs of those structures.
Upon receiving the Mansour and Girling-house bids, DOTD determined that the Polks were not entitled to receive replacement housing benefits with respect to the main residence because the price paid by DOTD to purchase the Polks’ property ($248,380) exceeded the estimates received for building a comparable residence ($164,-441 by Mansour and $163,875 by Girling-house, the latter’s $204,711.23 replacement cost estimate being reduced to take depreciation into account). By letter dated July 18,1984, DOTD advised the Polks that they were not entitled to any payment for the purchase of a replacement dwelling. The letter also stated that if the Polks chose to replace the pool or the outbuildings, “then an additional replacement housing payment will be computed based upon actual cost.” The letter concluded by advising the Polks that if they were dissatisfied with the eligibility determination, they could appeal *246 through the process explained in the department’s brochure on relocation benefits. Mrs. Polk filed suit against DOTD on August 1, 1984.
(D) The “Second” Mansour Estimate on Replacement Housing Costs
At trial, building contractor Donald Mansour, who earlier provided DOTD with a replacement housing cost estimate of $164,441, testified as an expert witness on behalf of the Polks. He testified that the $164,441 replacement cost estimate, prepared by his assistant Tompkins, did not truly reflect the replacement cost of the Polks home, but was merely an estimate for a similar home with the same square footage and number of rooms. Mansour testified that the hexagonal shape of the Polks home was unique and would cost three times more to replace than a home of the same size with a rectangular shape. He also testified that the Polk home contained many custom made features and high quality materials. Based on an estimate he prepared after suit was instituted, Mansour testified that it would cost $302,-270.86 to build a replica of the existing residence, and $108,471.99 to replace all of the other improvements on the property, for a total replacement cost of $410,742.85. This figure was accepted by the trial court and formed the basis for its determination that DOTD is liable to the Polks for $170,-362.85 ($410,742.85 total replacement cost minus $248,380 purchase price) in replacement housing benefits.
(II) LEGAL ISSUES
The primary issue presented by this case is whether the Polks were entitled to receive replacement housing benefits from the state for the cost of building a replacement home. Plaintiff does not allege that the $248,000 paid to her when DOTD purchased her property ($185,767 for the residence and $62,613 for the other improvements) was inadequate with regard to the market value of the home and improvements. Thus, this is not a suit against DOTD for failure to pay just compensation for the property taken, under Art. 1, § 4 of the Louisiana Constitution. Instead, she alleges that in addition to being compensated for the value of the property, she is entitled to the additional amounts which she would have been required to expend if she had built a replica of the existing home and other improvements. Plaintiff claims that she is entitled to such an award on two essentially distinct legal grounds: (1) because DOTD employees verbally promised that she would be paid such benefits, and she relied on their assurances to her detriment, and (2) because she is statutorily entitled to such benefits under the laws which pertain to DOTD awards of replacement housing costs, La.R.S. 38:3101-3110.
We note that the lower courts devoted little attention to the statutory scheme which governs replacement housing costs, and instead based their respective determinations that plaintiff is entitled to recover such benefits on the rationale that, independent of any statutory provisions, DOTD employees entered a binding oral contract with the Polks and promised them that they would be paid the benefits necessary to allow them to construct a replica of their existing home. We now consider whether any such binding commitment to the Polks was actually made.
(A) Was There An Oral Contract Which Obligated DOTD to Pay Replacement Housing Benefits?
We conclude, on the basis of a thorough review of the testimony and evidence received at trial, that the record does not establish that DOTD employees promised the Polks that they would be paid replacement housing benefits. On a number of occasions, DOTD employees generally explained to the Polks the manner in which the department determined replacement housing benefits. These explanations, given by Walker, David, McGee and others, all contained an important qualification: replacement housing benefits would be paid only to the extent that the cost of acquiring or constructing a replacement dwelling exceeded the purchase price paid by DOTD for the Polks’ property and improvements.
*247 Nowhere in the record is there any suggestion that DOTD employees promised the Polks that they would receive a specific amount of replacement housing benefits. To the contrary, David explained to Mrs. Polk, at the time that he extended DOTD’s offer to purchase her residence, that a determination of replacement cost benefits had not yet been made in the Polks’ case. Further, based on conversations she had with McGee after her meeting with David but prior to signing the act of the sale on June 21, 1984, Mrs. Polk knew that DOTD had not yet made a determination with respect to replacement housing costs.
Plaintiff cites the following conversations between the Polks and DOTD employees in support of her argument that DOTD employees made an unqualified promise to pay replacement housing benefits: (1) the June, 1983 meeting of the Polks and Walker in Alexandria; (2) Terry Brown’s telephone call to Judge Polk, advising him that a “relocation plan” had been approved and (3) the June 8, 1984 meeting of Mrs. Polk and David in Baton Rouge. We find that none of these conversations supports plaintiff’s “oral contract” theory.
At the June, 1983 meeting, Walker told the Polks that it was DOTD policy to provide them with replacement housing which was of the same quality as the home in which they were then residing. This was a valid general statement of DOTD policy, but it hardly constituted a binding DOTD commitment to pay for the construction of a replica of the Polk home. At the time, Walker had not even seen the Polk home, and federal authorization for the acquisition had not been obtained. This was a very general and preliminary conversation between the parties about the acquisition process, in which no specific promises were made.
Brown’s telephone call to Judge Polk, advising him that a relocation plan had been approved, perhaps caused some confusion for plaintiff and her husband. Brown testified that approval of the relocation plan simply meant that DOTD could proceed with the process of acquiring the property and determining the Polks’ eligibility for replacement housing benefits. Perhaps the Polks did not understand this. Yet Brown did not promise that benefits necessarily would be paid, and the Polks independently had reason to know that benefits would be paid only if the cost of replacement housing exceeded the purchase price. Walker told them this in the June, 1983 conversation, and they were furnished a departmental brochure (which Mrs. Polk testified that she read prior to the sale) which explained the manner in which replacement housing benefits were calculated. And even if the Polks misunderstood Brown’s statement, it was later made clear to Mrs. Polk when she met with David in Baton Rouge that DOTD had not, as of that time, made any determinations with respect to the amount of replacement housing benefits.
Finally, there is no indication in the record that David made any unqualified promise to Mrs. Polk during the Baton Rouge meeting that DOTD would pay replacement housing benefits. Instead, he explained the general manner in which those benefits were calculated (cost of actual replacement minus purchase price) and told her that the calculation had not yet been made with respect to the Polk residence, but would be made shortly.
It appears from the record that the Polks made an assumption that DOTD would pay them whatever it would cost to build a replica of their existing home. While we. do not question that the Polks honestly believed this would be the case, we find no testimony which suggests that any DOTD employee ever made such an unqualified promise.
In reaching this conclusion, we are not required to assess the credibility of conflicting testimony, because the testimony of the Polks and the various DOTD witnesses is not conflicting on any significant facts. The Polks and DOTD witnesses gave essentially the same versions of the pertinent conversations between the parties. It appears that the Polks may have made the mistaken assumption, based on these conversations, that DOTD had made an unqualified commitment to pay replace *248 ment benefits for the cost of building a replica of the Polk home. As discussed above, such an assumption was not justified under the circumstances.
At most, DOTD employees promised the Polks that they would receive in replacement housing benefits that which the law allows: the difference, if any, between the cost of acquiring a comparable home and the purchase price of the existing home. There was never any discussion of a specific figure, or a discussion of what would happen if DOTD and the Polks disagreed on what type of new residence would constitute a “comparable” replacement home, or on how much it would cost to build such a home.
In summary, there was no verbal contract between the parties.[2] We therefore turn to the separate question of whether the Polks were entitled to relocation benefits under the applicable statutes.
(B) Replacement Housing Benefits Under La.R.S. 38:3101, et seq.
(1) Statutory Framework
In 1970, the United States Congress adopted the Uniform Relocation Assistance and Real Property Acquisition Policies Act of 1970 (42 U.S.C.S. §§ 4601-4655). The stated purpose of the Uniform Act is to create and implement “a uniform policy for the fair and equitable treatment of persons displaced as a result of federal and federally assisted programs in order that such persons shall not suffer disproportionate injuries as a result of programs designed for the benefit of the public as a whole.” 42 U.S.C. § 4621.
In 1971, the Louisiana Legislature enacted La.R.S. 38:3101-3110, statutes which are patterned after, although not identical to, the federal relocation assistance provisions. These statutes make available various forms of “relocation assistance” for persons who are “displaced” as the result of the acquisition of their property by a state agency for a program or project undertaken by that agency.
The statutory provisions most pertinent to the issues raised in this case are as follows. La.R.S. 38:3103 provides that the acquiring agency may provide displacees with “relocation advisory assistance,” in the form of providing the displacees with services (as distinguished from monetary benefits) that are designed to assist them in locating replacement housing. La.R.S. 38:3104 provides that the acquiring agency may compensate displaced persons for moving expenses. La.R.S. 38:3105 provides that the acquiring agency may compensate the displaced person for certain “replacement housing costs,” not to exceed $15,000, and that replacement housing costs include “[t]he amount, if any, which when added to the acquisition cost of the dwelling acquired by the agency, equals the reasonable cost of a comparable replacement dwelling ... available on the private market.” R.S. 38:3105(A)(1).
When there is no housing available on the private market which is comparable to the housing being acquired by the state agency, the displaced person may be eligible for last resort housing under La.R.S. 38:3110. That statute provides that when comparable housing is unavailable, the agency constructing the project may use “any method practicable to provide adequate housing,” including, but not limited to:
payment for the benefit of the displaced person in excess of the sums specified by R.S. 38:3105 [the $15,000 cap], acquisition of land and construction of housing, *249 or other methods permitted under federal laws and regulations, (emphasis added)
The maximum amount of replacement housing benefits that can be awarded in a given case, then, depends upon whether a comparable residence is available on the private market. If there is such a comparable residence, La.R.S. 38:3105 limits the amount of available replacement housing benefits to $15,000. If, on the other hand, there is no existing comparable housing on the market, R.S. 38:3110 provides that replacement housing benefits may be based on the cost of building a comparable residence, and there is no statutory limit on the amount of replacement housing benefits that can be awarded in that situation. In this case, it is clear that there was no comparable housing on the market in the area of the Polks’ home. Thus, R.S. 38:3110 provided the proper basis for calculating replacement housing benefits, and the $15,000 limitation contained in R.S. 38:3105 is not applicable.
La.R.S. 38:3105(A)(1) further provides that agency determinations with respect to replacement housing benefits “may be made in accordance with standards established by the head of the agency making the additional payment.” La.R.S. 38:3107 further authorizes the head of the agency to “adopt such rules and regulations as he deems necessary” in order to implement relocation assistance, including a “[procedure for an aggrieved displaced person to have his determination of eligibility or amount of payment reviewed by the head of the agency.” However, the statutes do not specifically require or create any administrative review process with regard to determinations of replacement housing benefits or other relocation benefits.
(2) Are the Polks “Displaced Persons” Within the Meaning of the Act?
DOTD argues that the Polks are not entitled to relocation benefits of any kind because they are not “displaced persons” as that term is defined by La.R.S. 38:3101(3) and by DOTD regulations. R.S. 38:3101(3) defines a displaced person as “any person who ... moves from real property ... as a result of the acquisition of such real property ... for a program or project undertaken by an agency.” Pertinent to DOTD’s argument here, departmental regulations also provide that in order to be considered a displaced person (and to qualify for benefits), a person must be “in occupancy” of the property to be acquired, “at the initiation of negotiations for the acquisition of the real property....”
DOTD argues that “the initiation of negotiations” for the purchase of the Polks property was on June 8, 1984, at which time DOTD gave Mrs. Polk a written offer to purchase the property. At that time, DOTD argues, the evidence shows that the Polks were no longer living in the acquired residence. Instead, they had moved to a nearby camp house located on property which was not acquired in the purchase.
We reject this argument, as did the lower courts. First of all, the evidence is inconclusive as to whether the Polks had in fact moved out of the acquired residence as of June 8, 1984. Mrs. Polk’s testimony indicates that, in anticipation of the coming move, she and her husband had moved some of their things to the camp house and were spending some time there, but were still residing in the main residence.
Furthermore, negotiations for the purchase of the Polk property had been ongoing for some time prior to June 8,1983, and the Polks had been told again and again that their property would soon be purchased by DOTD. We are not prepared to say that a person who establishes a temporary residence, in anticipation of the pending acquisition of his primary residence by the state, is no longer “in occupancy” of the primary residence within the meaning of the departmental regulation. This regulation appears designed to disqualify persons from receiving relocation benefits if they move into a home while negotiations are underway for acquisition of that home as part of a public project, or if they move away from such a home well before negotiations begin. Obviously that situation is not present in this case, as the Polks lived *250 in the home for a number of years prior to the acquisition negotiations.[3]
Accordingly, we conclude that the Polks are “displaced persons” who are eligible to receive relocation benefits.
(3) Exhaustion of Administrative Remedies
DOTD also argues that the Polks should be precluded from bringing this suit because, upon being advised that they would not receive replacement housing benefits, they failed to follow the administrative appeal procedures provided by departmental regulations. We disagree, as did the lower courts.
We have recognized that as a general rule, a person aggrieved by the action of a state agency must exhaust all administrative remedies provided by that agency before being entitled to judicial review. The rationale of this requirement is that disputes pertaining to matters of agency regulation and expertise should ordinarily be first addressed by the administrative tribunals which the Legislature created to decide such issues. Steeg v. Lawyers Title Ins. Corp., 329 So.2d 719, 722 (La.1976); O’Meara v. Union Oil Co., 212 La. 745, 33 So.2d 506 (1947). Part of the function of the exhaustion doctrine is to give the agency whose decision is under attack an opportunity to review, supplement and, if necessary, correct its decision. Bonomo v. La. Downs, Inc., 337 So.2d 553, 556 (La.App. 2nd Cir.1976).
However, the exhaustion doctrine, like most judicial doctrines, is subject to a number of exceptions. “Application of the doctrine to specific cases requires an understanding of its purpose and of the particular administrative scheme involved.” McKart v. United States, 395 U.S. 185, 193, 89 S.Ct. 1657, 1662, 23 L.Ed.2d 194 (1969). See also Ecology Center of Louisiana, Inc. v. Coleman, 515 F.2d 860, 865-66 (5th Cir.1975). In this case, we do not apply the doctrine because we find that the minimal administrative review process which was available to the Polks was effectively exhausted.
As noted above, the pertinent statutes do not create or require a process of agency review of decisions regarding relocation benefits. La.R.S. 38:3107 provides that the agency head may establish a procedure for the review of such decisions. Here, the department created certain internal review procedures with respect to relocation cost eligibility decisions, whereby department officials review an “appeal” form submitted by the applicant and formulate written reasons in support of their decision. (DOTD Relocation Assistance Policy & Procedure Manual Rule 5.4.1.6). However, there is no provision, by statute, or by departmental regulation, for any type of adversarial hearing.[4]
While plaintiff did not file a formal written appeal of DOTD’s decision denying her claim for relocation benefits, her dissatisfaction with that decision was made known to the pertinent DOTD officials involved. *251 Further, the agency officials who would have been required by DOTD regulations to formally “review” the decision to deny benefits were the same officials who had already reviewed the circumstances sur-' rounding the Polks’ claim and made the decision to deny benefits. The reason for DOTD’s denial of replacement housing benefits — its belief that the cost of building a replacement home would not exceed the purchase price paid for the Polks’ residence —was made known to the Polks even if not formally set forth in writing as the result of an agency appeal process. Nor is there any indication that DOTD’s decision to deny replacement housing benefits would have changed if the formalities of the departmental review procedure had been strictly followed.
Given these overall circumstances, we find that, as a practical matter, the minimal administrative review mechanism provided by DOTD regulations was exhausted here. We reject DOTD’s argument that plaintiff’s failure to file a written appeal in the manner contemplated by DOTD regulations, requires dismissal of her suit.[5]
(3) Replacement Housing Benefits
DOTD based its denial of replacement housing benefits on its determination that the Polks would not have to expend more for a replacement residence than they were paid for the acquired property. The lower courts did not discuss the standard of judicial review applicable to this agency decision, and failed to recognize that DOTD is entitled to a reasonable amount of agency discretion in making determinations under La.R.S. 38:3101, et seq.
This Court has recognized that it is not the province of the judiciary to substitute its judgment for a legitimate agency determination, or to interfere with an agency’s exercise of its discretionary functions. Therefore, and as a general rule, unless the reviewing court finds that the agency’s factual determination was unreasonable, arbitrary or capricious, that determination should be upheld. Delta Bank & Trust Co. v. Lassiter, 383 So.2d 330 (La.1980); Hagood, v. Pickering, 385 So.2d 405, 409 (La.App. 1st Cir.1980). See also LA.R.S. 49:964(G).
Certainly, DOTD is entitled to the benefit of this standard of review with respect to the factual determinations it made when it attempted to determine whether plaintiff was eligible to receive replacement housing costs. The relocation benefit statutes themselves clearly envision a fair amount of agency discretion in this area. The statutes authorize the award of such benefits, but do not require that they must be awarded in any particular case. With respect to replacement housing benefits, La. R.S. 38:3105(A)(1) states that all determinations of such benefits are to be made “in accordance with standards established by the head of the agency making the additional payment.”
Thus, in examining the plaintiff’s claim for replacement housing benefits, our inquiry is (and the lower courts’ inquiry should have been) whether the agency’s determination that she is not entitled to such benefits was unreasonable, arbitrary or capricious.
The basis for DOTD’s determination that plaintiff is not eligible to receive replacement housing costs was that the cost of a new residence would not exceed the amount which DOTD paid for her property.[6] In order to test the reasonableness of this conclusion, we will now examine the estimates for replacing the Polk home that *252 were provided by various building contractors.
(a) Replacement of the Primary Residence
Rick Tompkins estimated that it would cost $164,441 to build a home having the same square footage and number of rooms as the Polk residence. However, Tompkins never viewed the Polk home before making this estimate. Instead, he relied on information provided to him over the telephone by a DOTD representative. DOTD argues strenuously that it was not required to furnish the Polks with the money to build a replica of their existing home, but merely a comparable home of the same size and number of rooms, constructed of quality materials and in compliance with applicable building and safety codes. Accordingly, DOTD argues that it properly relied on the Tompkins estimate in determining that plaintiff did not qualify for replacement housing benefits.
We agree that a “comparable” replacement dwelling need not be a replica of the acquired dwelling. Replacement housing benefits should simply be sufficient to allow a displaced person to acquire a new residence which is as similar as reasonably possible to the former dwelling. However, the Tompkins bid can hardly be considered an adequate gauge of the cost of building a home comparable to the Polks’ residence. The bid was made wholly without reference to the nature of the Polk home, the materials used therein, the shape of the home, etc. While DOTD had no obligation to provide an estimate on building an identical residence, something more than a blind estimate made on generalized information was required in order to determine the cost of building a truly comparable home. Thus, the Tompkins estimate did not provide a reasonable basis for the agency’s decision to deny replacement housing benefits.
On the other hand, the estimate provided by Girlinghouse did provide a reasonable basis on which DOTD could calculate the cost of building a comparable residence. This estimate was made based upon Girlinghouse’s personal examination of the house, and assumed that the replacement house would have the same shape, number of rooms and square footage. Gir-linghouse also made his calculations based on the assumption that most (though not all) of the types of materials used in constructing the acquired residence would be used for the new residence. The Girling-house estimate that it would cost $202,711 to build a comparable residence was properly relied on by DOTD in calculating replacement housing costs.
That being the case, it was unreasonable for DOTD to make no award for replacement housing benefits on the main residence. Girlinghouse’s estimate for building a comparable home (excluding the additional improvements), $202,711, exceeded the purchase price which DOTD paid for the home (excluding improvements), $185,-767, by $16,944.
Apparently, DOTD did not award $16,944 in replacement housing benefits based on the Girlinghouse bid because it chose to discount Girlinghouse’s $202,711 replacement cost figure to take into account depreciation of the value of the main residence. Girlinghouse testified that after taking into account depreciation, the main residence was worth $163,875. DOTD relied on that figure (as well as on the Mans-our/Tompkins estimate) in support of its determination that replacement of the main residence would not cost more than the $185,767 acquisition price which it paid for the home.
It was, however, unreasonable for DOTD to base its determination of replacement housing benefits on a cost estimate that was discounted for depreciation. The relevant inquiry for the purpose of calculating replacement housing benefits was the amount that the Polks actually would have to expend for the purpose of obtaining a comparable home. Obviously a comparable home would be built with new materials, and a replacement cost estimate discounted for depreciation would not reflect the actual cost of building a new home. While it was reasonable for DOTD to rely on Gir-linghouse’s replacement cost estimate of *253 $202,711, it was unreasonable for DOTD to discount that estimate for depreciation and to rely on the discounted figure as a basis for denying replacement housing costs.
Accordingly, DOTD should have awarded the Polks replacement housing benefits on the main residence in the amount of $16,-944, the difference between the replacement cost estimate provided by Girling-house ($202,711) and the purchase price paid for the main residence ($185,767).
It is true that Donald Mansour, plaintiffs expert at trial, provided a much higher estimate for replacement of the main residence, $302,270.86. The differences between the Girlinghouse and Mans-our bids appear to be in part because of Mansour’s higher estimates for profit and overhead, and in part because of the fact that Mansour’s estimate included some materials of higher quality than Girling-house’s. For the most part, however, there were no significant differences between what the two bids promised to do, as both were for the building of a home that was substantially similar to the main residence.
Therefore, it was not unreasonable for DOTD to calculate replacement costs based on the lower bid submitted by Girling-house. Because it was not unreasonable, arbitrary or capricious for DOTD to rely on the Girlinghouse estimate, the trial court erred by relying on the higher Mansour estimate as a basis for calculating the cost of replacing the main residence.
The court of appeal affirmed the trial court’s reliance on the Mansour bid on the rationale that the trial judge should be given great discretion in assessing expert testimony, and his decision to rely on the testimony of one expert over another should not be reversed absent manifest error. That standard of review, however, does not apply here, in a case involving review of a discretionary decision by a state agency. The trial court’s inquiry should have been whether it was reasonable for DOTD to rely on the Tomkins and Girlinghouse bids. We have determined that it was unreasonable for DOTD to rely on the Tomkins bid, as that bid did not provide an estimate for the replacement cost of a truly comparable home. However, it was reasonable for DOTD to rely on the Girlinghouse bid, which, though lower than the estimate provided by Mansour at trial, did provide an adequate estimate for the cost of building a truly comparable home.
(b) Replacement Cost of Other Improvements
Improvements located on the property near the main residence included a swimming pool, guest house, barn, equipment shed, and car shed. The lower courts found that plaintiff is entitled to recover the replacement cost of these structures, minus the amount paid for them by DOTD when it acquired the property. Because these structures functioned as part of the Polks’ homestead, we agree that they should be included in the replacement housing cost calculation.
Neither Girlinghouse nor Tompkins provided DOTD with an estimate for replacing the various improvements (other than the main residence) which were located on the acquired property. Mansour, on the other hand, provided estimates at trial for replacing the guest house, pool, barn, car shed and equipment shed.
DOTD had the opportunity to present evidence as to the replacement cost of those structures, but did not do so. As the only evidence on replacement cost for these structures came from Mansour, we accept his figures on these items. Those figures establish that while the state paid Mrs. Polk $9,500 for the pool, a similar pool would cost $18,500 to build (an estimate provided to Mansour by the contractor who constructed the Polks’ pool), a difference of $9,500. Mansour’s uncontradicted figures also establish that while the state paid $26,-000 for the guest house, a similar guest house would cost $37,415 to build, a difference of $11,415. With respect to the remaining structures on the acquired property, Mansour’s figures establish that the Polks are entitled to replacement housing benefits of $14,590 for the barn ($19,090 replacement cost minus $4,500 acquisition cost), $1,416 for the car shed ($2,208 replacement cost minus $792 acquisition cost) *254 and $10,039 for the equipment shed ($14,-729 replacement cost minus $4,690 acquisition cost.)[7] All told, Mansour’s uncontra-dicted testimony established that the Polks are entitled to recover replacement housing benefits of $46,960 with respect to improvements other than the main residence. DOTD failed to show a reasonable basis for its decision not to award replacement housing benefits for these improvements. Therefore, we affirm the decision of the courts below to award benefits for these improvements based upon Mansour’s estimate of their replacement cost ($46,960).
DOTD argues that because the plaintiff has not actually built a new pool, guesthouse, barn, car shed and equipment shed, and because there is no evidence that she intends to do so, she is not entitled to replacement costs for these structures. The record indicates that plaintiff clearly intended to build a comparable home with similar improvements but did not do so because of the uncertainty caused by this litigation—and perhaps because of the fact that she intended to use the money received from DOTD for replacement housing benefits, to help accomplish this construction. Under these circumstances, we believe it is proper and fair to award replacement housing benefits for these items. We note that DOTD made a determination regarding replacement housing benefits for the main residence without first requiring plaintiff to build a new home, and see no reason why there should be any such prerequisite for determining replacement benefits due for the other improvements on the property.[8]
(4) Moving Expenses
As a displaced person, plaintiff clearly qualified for moving expenses under La.R.S. 38:3104. We find unreasonable DOTD’s decision to deny plaintiff' reimbursement for those costs on the ground that she did not technically follow the application procedures for moving expenses as set out in department guidelines. Clearly DOTD was aware of her plans to move, and at least three of its employees advised her that she would receive reimbursement for moving expenses. We approve the $8,000 award allowed by the lower courts for moving expenses.[9]
(5) DOTD’s Reconventional Demand
After plaintiff filed suit for relocation benefits, she also obtained a preliminary injunction from the trial court, prohibiting DOTD from taking possession of the property while the suit was pending. DOTD reconvened for “rent” due from plaintiff during the period that the injunction was in effect, in the amount of ½ of 1% of the purchase price per month. The preliminary injunction was dissolved only after the trial on the merits, and DOTD claims that it is entitled to recover rent from plaintiff totaling $18,628.50. The *255 lower courts rejected the recoventional demand, as do we.
La.Civ.Code art. 2486 provides that if the seller fails to timely deliver the property sold to the buyer, “the seller is liable to damages, if there result any detriment to the buyer, occasioned by the non-delivery at the time agreed on.” Apparently DOTD relies on this article in support of its recon-ventional demand for damages. However, DOTD presented no evidence at trial to show that it suffered any detriment from the fact that it was unable, by virtue of the preliminary injunction, to take possession of the property at an earlier date. DOTD accordingly is not entitled to any recovery on its recoventional demand.

Decree

For the reasons set forth above, we hold that the amount awarded to plaintiff by the lower courts for replacement housing benefits, $170,742.85, should be reduced to $63,-904 ($16,944 for the main residence, $11,-415 for the guest house $9,500 for the pool, $14,590 for the barn, $1,416 for the car shed and $10,039 for the equipment shed)). We also affirm the plaintiffs $8,000 award for moving expenses, resulting in a total recovery for plaintiff of $71,904. The court of appeal’s judgment is amended to reduce plaintiffs judgment accordingly, and as amended, affirmed.
AFFIRMED AS AMENDED.
WATSON and COLE, JJ., concur in part and dissent in part, and assign reasons.

. As reflected on trial exhibit P-1, the state’s $248,380 acquisition offer for the main residence and improvements was broken down as follows: main residence, $185,767; guest house, $26,000; concrete walks, $140; fence, $735; green house, $1,536; well house, pump, and tank, $2,750; frame storage shed, $300; guest house water well, $2,500; guest house concrete walks, $250; car shed, $792; equipment shed, $4690; gravel, $8,400; additional fencing, $750; red barn, $4,500 and swimming pool, $9,000.

. As hereafter discussed, we conclude that plaintiff is entitled to replacement housing benefits under the pertinent statutes, with the only remaining issue being whether DOTD abused' its discretion in the determination of the amount of those benefits. For that reason, the argument made by Justice Cole in dissent, that DOTD officials promised Mrs. Polk that she would be entitled to the difference between the purchase price and the cost of replacement housing, misses the point. The Polks were entitled to recover that amount by statute, regardless of whether they were so advised by DOTD officials. The basis of the Polks recovery is and must be statutory, for there was never a binding agreement between the parties as to whether (1) the reasonable costs of replacement actually would exceed the purchase price, and if so, (2) by how much.

. In order to be eligible for replacement benefits under La.R.S. 38:3105, which permits an award of benefits up to $15,000 when the displa-cee purchases a comparable existing home, the owner of the acquired property must have resided there "not less than one hundred and eighty days prior to the initiation of negotiations for the acquisition of such property_” La.R.S. 38:3105(A). While we believe that the Polks met the 180 day requirement in this case, we have noted in the body of the opinion, Section 11(B)(1), supra, that the Polks’ claim for replacement housing costs is governed by La.R.S. 38:3110 rather than R.S. 38:3105. R.S. 38:3110 does not contain the 180 residency requirement which is set forth in R.S. 38:3105.

. The Administrative Procedure Act (APA), La. R.S. 49:952 et seq., provides the guidelines which are applicable to administrative hearings. See La.R.S. 49:955-960. While DOTD is one of the state agencies to which the APA generally applies, the provisions of the APA which pertain to administrative adjudications, see La.R.S. 49:955-960, are not triggered unless the agency determination in question is one which, by virtue of an independent statutory or constitutional provision, cannot be made unless the agency gives the claimant notice and opportunity for a hearing. Delta Bank & Trust Co. v. Lassiter, 383 So.2d 330 (La.1980). Here there is no statutory requirement for an agency hearing regarding replacement housing benefits, and no argument that the state constitution requires such a hearing. Therefore, the provisions of the APA which govern agency adjudications do not apply in this case.

. In Bounds v. State Department of Highways, 333 So.2d 714 (La.App. 2nd Cir.1976), writ denied, 338 So.2d 295 (La.1976), the court of appeal dismissed plaintiffs claim for replacement housing benefits on the ground that he had failed to exhaust the administrative remedies provided by DOTD departmental regulations. In Bounds, there is no indication that, as in this case, DOTD’s requirements for internal review were effectively satisfied even though the claimant did not file a formal, written appeal with the agency. Therefore, Bounds may be distinguishable from this case on its facts.

. AH parties agree that there were no homes for sale in the area which were comparable to the Polk residence. Thus, the determination of replacement housing benefits had to be made with reference to the cost of building a comparable home, rather than buying a comparable home.

. There was also a greenhouse and well house, but an estimate for their replacement cost is included in the Girlinghouse estimate for replacing the main residence. Because we have determined that Girlinghouse’s estimate provides the proper basis for calculating replacement housing benefits with respect to the main residence, the award we allow for the main residence includes compensation for replacement of the greenhouse and well house. There were other structures on the property, including fences and concrete walks, see supra note one, for which the state compensated the Polks upon acquiring the property and for which no replacement cost estimate was provided (apparently because Mansour accepted the value allocated to these items in the act of acquisition as adequate to cover replacement).

. La.R.S. 38:3105(A)(4) provides that when the displaced person purchases an existing residence, the replacement housing benefits allowed in that situation (up to $15,000) are only available if the displaced person "purchases and occupies a replacement dwelling ... not later than the end of the one year period beginning on the date on which he receives from the agency final payment of all costs of the acquired dwelling, or on the date on which he moves from the acquired dwelling, whichever is the later date." As we noted elsewhere, La.R.S. 38:3105 does not apply to the award of replacement housing benefits in this case, so the one year requirement is not applicable. La.R.S. 38:3110, which provides the basis of the replacement housing award to the Polks, contains no such requirement.

.That award was based on the moving expense estimate of DOTD’s own expert, which was the lower of two estimates presented at trial.